Good morning. Before calling the first matter on calendar, let me just remind counsel for appellants that our clocks do not visibly take any account of time that you wish to reserve for rebuttal. So what you see is what you've got in total, and if you don't want to be disappointed and you do want to have time for rebuttal, the best thing to do is just to stop talking with some time left on the clock. So all of that said, we'll now hear argument in United States v. Khan. I think they got that. Good morning, Your Honors. Elisa Solano-Peterson for appellants. I just want to briefly touch on a few points. First of all, in regards to the change of plea in the first case, which is the fraud involving the aircraft parts case, I think that the record shows that there is a reasonable probability that the defendant would not have pled guilty. The reason is that he was in the middle of trial. He was in the fourth day of trial. There was no plea agreement in the case. In the last minute, he decided to plead guilty. There was no particular benefit for him. The government, you know, what was the need? Why wouldn't we need after he pleaded guilty? Pardon? In order to show a reasonable probability, why wouldn't you need in the record either an affidavit from him saying, I would not have pleaded guilty, but for a motion supported by an affidavit after he pleaded guilty, and ideally before the pre-sentence report came in saying, hey, wait a minute, I wasn't going to plead guilty under this deal, or even an affidavit and a motion after the pre-sentence report came in saying, I would not have pleaded guilty had I but known that I was subject to restitution and so forth? Well, I think that would be too restrictive an interpretation of a reasonable probability, because many defendants, you know, after advice of counsel, they don't think about it until, you know, after everything is over, and they don't really realize the consequences of their guilty plea until after they're sentenced and had time to think about it. And some, you know, many times there might be, you know, an ineffective assistance issue in regards to pleading guilty. So I think you could also prove it by the record. And in this case, I think there is enough to say that there was a substantial probability he would not have pleaded guilty. Is there anything in the record to suggest that, except that he pleaded after three days of trial? Well, the fact that there was no plea agreement, the fact that there was, you know, no particular benefit in the sense that the government was not saying that they were going to take any, you know, position. I don't understand why that supports the inference that he would not have pleaded guilty but for what the judge said. It seems like first he hears just how good a case the government has and thinks, wow, that's pretty good, I'm going to get nailed. And then he pleads without a written plea agreement, and he decides to plead before the colloquy. So the errors in the colloquy cannot possibly have induced his decision to say, keep the jury in the jury room, we've got something to do here, I want to change my plea. And then the judge makes this, his script isn't all prepared, because what he was prepared for is trial. Right. Well, I think the whole purpose of the colloquy is we don't want the defendant to enter a guilty plea before he's properly informed. So therefore, it doesn't matter, you know, the question is, would he have still pled guilty if he had been properly informed? And I think it's too restrictive an interpretation of, you know, the Benitez case to say that the defendant has to affirmatively, you know, submit a declaration or anything like that, and I – and it's our position that the record does show that there's a substantial probability, considering the errors and the cumulative error, and the fact that there was no plea agreement, that that should be enough. And in regards to the other issue, there is a question as to whether there was a sufficient factual basis in the other case, the arms export case, because there actually wasn't any actual exportation, and, you know, what the record shows and what he did plead guilty to in, you know, in – I mean, what he admitted to in his factual basis is that there was an attempt at exportation, but actually, apparently, nothing actually left the United States. So that's why – Well, that's because the Feds intercepted it. Right. But it's the defendant's position that there has to be, you know, actual exportation in this kind of offense, and so there was an insufficient factual basis. And also, just in touching the loss issues in the fraud-involving aircraft parts case, as far as the amount of loss is concerned, obviously, the defendant stipulated a certain amount of loss, but then there was a lot of loss where there were FAA forms found on his premises. Now, that's insufficient. There is no proof that he actually sent those forms. The FAA forms – Well, the special agent's declaration provides a pretty substantial basis for a finding that those were, in fact, also sales. Well, I think – well, the ones that are disputed, the point is that there are these And he sold 10 widgets. So there's not, you know, a strict correlation between the FAA forms and, you know, what was sold. And all they said, basically, was that these FAA forms were found on his premises. They didn't even say in the same file with the invoice or anything else. They were just these FAA forms found on his premises for many times for a much larger amount of stock than what was sold, and they're saying that shows it was a fraudulent sale. Well, that's insufficient proof that he actually had used that for the customer. I don't see why it's insufficient. I mean, the nature of criminal activity recognized by the guidelines is that it will often be difficult to ascertain the exact amount of loss and, therefore, a reasonable estimate that would not suffice for, say, tax purposes may well suffice for sentencing purposes. Well, in this case, it isn't so much, you know, that you can't tell the amounts and that, obviously, there are invoices that say $200 or whatever. But the problem is, was this actually a fraudulent transaction? And when you just have FAA forms on his premises and then the agents match it up with some parts, that's just insufficient. I thought the fraudulent aspect, there were two sets of crimes he committed. One was trying to sell military parts to the Communist Chinese, and the other was trying to pass off reconditioned parts and aluminum parts as brand-new steel parts for American planes. And I think you're talking about the latter. Is that correct? No, I'm talking about the sales of the used aircraft parts. That's what I said. Yeah, right. Not the arms. That's what I said. I meant latter, L-A-T-T-E-R. Yes. Now, on those, if you're trying to pass off something, it involves a certain amount of sneaking around, and it's going to be difficult to reconstruct. What's unreasonable about the way they reconstructed it? Well, it's a defendant's position that just the fact that there are some forms found on his premises, and it wasn't even a correlation. It wasn't, like I said, it's not 20 parts here, 20 parts there. There were these generic forms. Now, whether he submitted those generic forms with those particular parts transaction is, I believe, very iffy. So that's why we're saying, you know, it's insufficient. And also, in regards to the conscious or reckless risk of death or serious bodily injury, I think when you have fraud involving aircraft parts, obviously, you know, you could say that there is, you know, some risk. You have aircraft parts. Maybe they were used and they're passed on as new or, you know, whatever. And so there's a penalty for that. The penalty can be death for a plane full of passengers. Well, what I'm what it's a defendant's position that basically the punishment, you know, is in that offense. Now, if you're going to have this enhancement on top of that. You could theoretically have been selling used video equipment or maybe a headset on the helicopter that would not involve any risk of anything other than discomfort. But the parts that he was passing off are critical and consequential to the safety of the helicopter.  I don't see how with a straight face one can make an argument that there wasn't a risk of serious injury. Well, briefly, just to touch on it, there was the issue where the aluminum parts were really that, you know, that much inferior to. However you slice it, even if you're right that they had a thousand-hour life, or even if they had a 2,000-hour life, there's still a difference between 1,000 and 2,500 that can mislead someone into believing that they had a whole big safety cushion out there. Right. Well, you know, it's our position, especially with the mix-up, whether it was uncertain whether the parts that were actually tested were the parts that were submitted, and the fact that, you know, you could use the aluminum parts. I mean, it was insufficient for an extra enhancement. Well, there's nothing on the turbine. There's nothing to say the turbine blades were not just plain dangerous, period. It wasn't a question of being aluminum versus steel. They were just plain dangerous, and they could fly apart and tear the engine apart and or tear the cabin apart, and his attitude is, oh, well. Well, I think with the evidence presented, they didn't really present such a compelling case as such, I mean, with the testing and everything else. And I do, unless there's further questions, I'd like to reserve the rest for rebuttal. I have one more question, kind of a general one. I'd like to ask you about the defects in the Rule 11 colloquy. It's pretty plain that it was, at least in some respects, defective. It's arguable whether the defects were material. However, it's difficult to come up with a good script when somebody changes his plea in the middle of trial and you've got a jury waiting. My thought was you have to be pretty careful about allowing a defendant to get away with changing his plea in the middle of the trial, lying in the weeds and not objecting while there are some defects in the colloquy. And then after the witnesses have disappeared, and in some cases, no suggestion that it's true in this case, but in some cases, witnesses might disappear with the defendant's assistance, criminal or not. And then after that, saying, oh, wait, there were some defects in the Rule 11 colloquy. I didn't mention them to you at the time, but here they are. And so now I want to go to trial again, and too bad you don't have those witnesses anymore and you don't have your ducks in a row anymore to prosecute. It seems like we have to guard against that. Well, just one brief point on that. I think you also have to guard against having such a restrictive rule in regards to Benitez that the defendant has to do something right then and there, you know, like before sentencing, because often it's under advice of counsel, and like I said, there could be ineffective assistance, and we don't want to bar, you know, interpret Benitez so narrowly that we bar a defendant because he did this under advice of counsel, and maybe it was bad advice, et cetera, et cetera. Is there any reason to imagine that it might have been bad advice? It looks like it actually looks like a great deal he got. It actually looks like he blew up his trial by trying to put in a perjured document. So Judge Kleinfeld's scenario is just right on, isn't it? Well, an appellant would disagree with that, and I think I'd like to reserve the rest of this. Okay. Certainly. Mr. McCormick. Good morning, Your Honors. May it please the Court. This is the United States Attorney, Doug McCormick, for the government. Mr. Kahn did blow up his trial. He tried to admit a perjured document, and when that went poorly for him, he decided to plead guilty during the middle of trial. As Judge Kleinfeld points out, when that happens, sometimes the script isn't perfect, and with respect to the Central District, there was a defect, and that restitution was not specifically spelled out. The Court's authority to award restitution, and the government's conceded that point. Nevertheless, Senator Dominguez-Benitez, in this Court's precedent, the defendant has to show plain error, which means he must show a reasonable probability that but for the error, he would not have pleaded guilty, and the defendant simply has not made that showing. The defendant was informed prior to his sentencing hearing that he faced restitution of $5.4 million. There was extensive pre-sentencing litigation over everything imaginable. At no point did the defendant cry foul about the amount of restitution he faced. He proceeded to sentencing and never tried to withdraw his guilty plea. And it didn't exceed the amount of fine he was told he might get, right? The defendant was told that he faced a fine of $3 million or twice the gross gain or loss resulting from the offense. The Court did not specify what that latter amount was, gross gain or loss. The gross gain or loss, in fact, was $5.7 million, so twice that is $11.4 million. So, yes, he, in fact, was told about a potential fine that far exceeded the amount of restitution awarded. The Appellant's Counsel raises today for the first time a claim of ineffective assistance. The government would submit there's no basis in the record for any kind of claim of ineffective assistance at counsel, either at trial or at sentencing. As the record shows, this case was extensively litigated both at trial and at sentencing. Turning to the one other Rule 11 issue raised this morning, which is a sufficiency of the factual basis for the District of Columbia case. That's the Arms Export Control Act that was transferred here under Rule 20 following the Central District plea. There, if you look at the factual basis in the excerpts of record, what it shows is the defendant admitted that he took all the steps necessary to export. He shipped the parts to China. As Judge Reimer pointed out, it was then the fact that the entity in China didn't exist. It was a fictitious undercover entity that resulted in those parts not getting to where they were going. But the defendant did everything he needed to do. He sent them, he signed the waybill, and in certain circumstances he made misrepresentations on the waybill about what was in the ship. Turning then to the sentencing issues, and I'm happy to talk about either the sufficiency of the evidence of loss or the risk of death or injury in really significant detail. But with respect to the death and injury, I think there's two points I'd like to make. One is that I think it's sufficient for the court to find either risk of death and injury with respect to the helicopter grip assemblies, which was discussed during appellant's argument. Those are the ones that were represented to be steel parts when they were in fact aluminum parts. And the appellant really doesn't contend that there is any kind of defect in the government's showing with respect to the discrepancy between those two kinds of parts. Could you tell me what a helicopter grip assembly does? It was kind of abstract in the briefs. I don't know what it means. It's a part that's kind of shaped like this, and it literally holds the tail rotor to the main body of the aircraft. Is this something that the pilot of the helicopter grips, or is this a part within the wires and cables of the helicopter? If you're familiar with a helicopter, there's a tail rotor on the back of the aircraft that spins. The helicopter grip assembly holds that tail rotor in place and spins itself as it is powered by the helicopter. So what one has to imagine is that if an aluminum part, which was kept on the helicopter past its useful life, were to fail, were to fly apart, crack, rupture, the tail rotor would then become dislodged, vibrate in a way it's not supposed to vibrate, what have you. That would have serious consequences for the airworthiness of the helicopter. So this is a part that holds the spinning part, the rotor, onto a rod that's caused to spin by the engine. Correct. And the idea is if it's aluminum, of course aluminum is more fragile than steel. Aluminum does not have the strength, the tensile strength of steel. Then the tail rotor may vibrate, come off, helicopter crashes. Correct. Well, it has the tensile strength probably, it just doesn't have the life. I'm probably misspeaking. I'm not a metallurgic expert. But basically the manufacturer does not rate the aluminum part as long as it rates the steel part. And I've held both of them in my hand. You can tell them apart when you're holding them in your hand. The aluminum part's light. But you can't tell when they're 20 feet off the ground up there on an aircraft part. And what was significant here is that the aluminum parts have been relabeled as steel parts. They have the steel part number on them. With respect to the jet engine vanes. The helicopters that these were for, the military around Fairbanks has some helicopters that just fly two people and some that fly huge amounts of people or supplies. I don't know what these are. These were for Huey helicopters. They were probably not the kind of helicopter you would see. They weren't modern helicopters. Mr. Kahn, the appellant's business was being an aircraft parts broker. Are Hueys the big ones or the little ones? They're big helicopters. They're basically troop transports, passenger transports. They've been fitted into all sorts of different uses. But they're big helicopters. Mr. Kahn's business was not selling to mainstream. He didn't sell to Boeing. He didn't sell to American Airlines. He sold to people who would be buying from aircraft parts brokers, generally overseas buyers. But nevertheless, aircraft safety is a worldwide priority, not just an American priority. With respect to the engine vanes and blades, the government made a showing based on testing of parts that recovered from two of the defendant's customers and parts that recovered from the defendant's facility itself. And in the record, there is evidence of the assembly line that the defendant had in place at his facility where he was taking these used— These are turbine vanes? Turbine vanes and blades. Vanes and blades. Are those the things you can see when you look in the front of a jet engine? You cannot see them from the front. You'd have to cross-section the engine. They are fairly small parts, again about the size of my hand here, that rotate or that spin and force the hot air through the engine and thereby create energy for the aircraft. The temperatures—I don't remember off the top of my head. They're in the brief. But they're extremely high temperatures inside these engines. And these pieces of metal are under extreme fatigue. And so when you have a piece that is believed to be new and it is not and doesn't have the proper cooling mechanisms, the evidence was from the Pratt & Whitney engineers who testified by declaration at the sentencing hearing that they could expel fragments or they could just shred apart. And that would cause other damage to the engine structure or even potentially cause the expulsion of metal debris into the fuselage of the aircraft. Again, it doesn't take a degree in aeronautical science to know that those are situations you do not want on your aircraft. The shrapnel that might go into the aircraft or the engines that might be destroyed, which aircraft were those for? These are big engines. These are engines that you would see on DC-10s, big passenger jets. That's what Pratt & Whitney builds is big engines for big jets. So these are big engines and they go on big planes, depending on what particular plane manufacturer might use that particular engine. So I think it was in the comment in the record at the sentencing hearing was this district judge who travels overseas quite extensively said, hey, look, every time I get on a plane in Bosnia, I'm going to be thinking about this case. Obviously something that troubled the court, the district court below. Unless the court has any further questions about either the Rule 11 issues or the sentencing issues, the government is prepared to submit. I have one quick question. On the restitution, I understand that you don't deduct any residual value of parts in calculating the sentence. What about the restitution? Well, I think there is a difference between the calculation for loss purposes and the calculation for restitution purposes. Essentially, having parts that do not have valid 8130s with them renders the parts worthless. And the defendant didn't contest at the hearing, at the sentencing hearing, he did not contest the amount of restitution. In other words, if I'm buying from you, Judge Fernandez, an aircraft part, because I'm an aircraft parts broker or I'm an aircraft parts user and I want to use it or sell it, I need a valid 8130 in order to either resell or use that part. Sure. Bogus 8130, the part is essentially useless. Okay. So you're saying they have no salvage value because no buyer, knowing what they are and not having a valid 8130 would buy them. That's correct. Even though they might have some functional utility, they're not marketable. I suspect you could take used and refurbished vanes and blades and put them on a jet engine, but they would have negligible value compared to the value for which they were sold, because they were sold as new parts. I was thinking that if I had a plane and I thought these might be in it, I would need to have engineers ground the plane and take it apart and make sure they removed any part that might possibly be reconditioned, so it would have a negative value to me if I was the owner. I'd have to spend all the labor. That's true. One of the difficulties about this case is the vanes and blades are not serialized. They do not have serial numbers on them. So you don't know. And I've been out to aircraft parts brokers. I went out, for instance, to Turbo Analysis in Phoenix, Arizona, to discuss with them trial testimony, and I saw what they do with these vanes and blades, and they basically put them, large bins is a bit of a simplification, but they just place them into large bins, and so they are mixed up with other vanes and blades from which the origin of those vanes and blades is pretty much lost. Were these going into the planes that ordinary folks like us fly? Ordinary folks like us fly, not here in the United States. You would never see a major domestic carrier buying parts in this stream of commerce, but there are. But if we fly on air Egypt when we're taking a trip abroad? I don't know about air Egypt specifically, but there are obviously people who buy from this stream of commerce, and whether those are private buyers or international carriers, I really don't know. Thank you. Thank you, Mr. McCormick. Ms. Peterson? I'd just like to say a few brief points. First of all, in regards to the restitution issue, it's appellant's position that there should have been a separate restitution hearing to determine actual damages, and there wasn't in this case. Is there some evidence to show it wouldn't have mattered? You heard my hypothetical about the manufacturer who knows that some of his parts came from this guy and has to spend money on labor to disembowel his airplanes on account of the risk that these parts may be in them. Is there some evidence that it would have mattered had there been more of a hearing on restitution or more consideration of sacrifice? Well, I don't think we can really say, unless there was a hearing, because what the defendant stipulated to did not amount to, you know, the $5 million. Well, show us that the error you claim might have mattered. Well, you know, well, first of all, you know, if you're saying some of those parts may actually have been okay. You know, just because the parts were used, a lot of the parts apparently were accepted. They weren't rejected. They were accepted, and they could very well have been okay, even though, you know, they were used parts. There's a problem in a you-never-know situation if you're flying an airplane. Well, they do regular inspections, and they're required to do regular inspections, and this is the kind of thing where there should have been some evidence in a hearing or, you know, brought in the people, the buyers, and, you know, asked them, you know, whether they were still using the parts or something, you know, things like that, because a lot of them probably would say that the parts were all right. So that's why there needed to be a restitution hearing, and there wasn't in that case. Any proffer to that effect? Pardon? Was there any proffer to that effect? You're talking about whether the defendant had requested that or? Well, A, requested it. B, told the judge, look, if I have a hearing, here's what I would expect to produce. Here are the witnesses that I'd like to have testify, and here's what they'll testify to, and here's why that'll have an effect on the amount of restitution that you decide to award. No, no. There was no proffer, but it also was incumbent on the court to hold a restitution hearing, and, you know, that's the defendant's position. Based on what case? Well, there were – there's a lot of cases in the brief, and like the U.S. v. Parrott. What case holds that you have to hold a restitution hearing, suesponding, period, in all cases? I don't know if there's a case that specifically says you have to have one suesponding. There are cases that say that, you know, you should hold a restitution hearing. Did he ask for one and have the judge say no, or he asked for one and the judge said, for what, and he didn't say? Or I don't remember the record on that. I don't believe he specifically asked for a separate restitution hearing. And there was one other point. Did he object to the restitution on the ground that he had not gotten a restitution hearing? No, I believe he didn't. And also, two other points. The government said that we were claiming ineffective assistance. Obviously, that's not proper on direct appeal. There's not enough evidence, you know, evidence on the record for that kind of thing, so that's not what we're asserting. I was just using that as an example. And also, briefly in regards to the conscious or reckless risk of death, you really need to look at, you know, what the experts are saying, and I don't think, according to the expert testimony that was submitted, that you could really, you know, it was to the degree that the government is stating, and you really need to look at, you know, what the experts are saying. Could you point us to where you want us to look? Well. Just give me a page number. I'll look. Well, I think you'd have to look at the whole, you know, report to see. I can't really put something specific. Well, what I'm looking for, the risk of death seemed kind of obvious, and what I'm looking for is something that shows, no, no, it's really not that dangerous. All that happens is you need more maintenance or something. There was a point where the government expert said that there is, you know, redundancy in aircraft, so if, you know, one blade fails or something like that, unless you have all the blades fail, you know, you're not going to have a catastrophic accident. So that's one of them. The other is that, you know, planes are required to have regular maintenance. And also, there was that whole mix-up as to whether the right part was tested. So that's something that the court should take into consideration. And that's all I have. Thank you, counsel. Okay. Thank you, Ms. Pierson. Mr. Conant, thank you for your argument in that. Thank you for submitting your argument in the Center for Biological Diversity, which is a Millennium Point development. Thank you.
judges: Fernandez, Rymer, Kleinfeld